Howard B. PETERSON, III, Plaintiff,

v.

**AIR LINE PILOTS ASSOCIATION, Defendant.**

No. C–80–341.

United States District Court, M.D. North Carolina, Winston-Salem Division.

Nov. 18, 1985.

Hamilton Horton, Winston-Salem, N.C., and Robert F. Gore, Springfield, Va., for plaintiff.

Gary Green and James W. Johnson, Washington, D.C., and Dan S. Walden, Winston-Salem, N.C., for defendant.

## MEMORANDUM OPINION
## AND ORDER

EUGENE A. GORDON, Senior District Judge.

This case comes before the court on defendant's motion for summary judgment. Briefly, plaintiff is an airline pilot who, from May 1977 until January 1979, served as a "replacement pilot" for Wien Air Alaska. During this period defendant Air Line Pilots Association (ALPA) and Wien were engaged in a bitter strike that was finally resolved after intervention by the President of the United States. As part of the agreement that ended the strike, the striking pilots replaced those nonunion pilots who had flown during the strike. The nonunion pilots were furloughed pending their recall as vacancies arose, and ALPA agreed not to take any retaliatory action against them. In May 1979, Peterson contracted to fly for Piedmont Aviation, Inc. and began flying as a first officer on June 16, 1979. No written contract was executed, but Peterson's rights and responsibilities were set out in the Piedmont-ALPA collective bargaining agreement (CBA), to which he was subject. Under the terms of the CBA Peterson was to fly as a probationary employee for the first twelve months of his employment, during which time he was to be liable to dismissal at the discretion of Piedmont.

Peterson flew without incident until July 19, 1979, when, at the inquiry of a Piedmont pilot with whom he was flying, he confirmed that he had flown for Wien during the strike. During the next two weeks Peterson was subjected to sporadic harassment—he was insulted and refused permission to pilot the aircraft in flight. In the first days of August, Peterson called Piedmont's headquarters in Winston-Salem and spoke with Captain Saunders, the Senior Vice-President for Operations, about the problem. Saunders invited Peterson to come to Winston-Salem and Peterson accepted. On or about August 3, 1979, Peterson met first with Saunders and next with Captain Sharp, the Director of Flight Operation and Acting Staff Vice-President for Flight Operations. Exactly what transpired during these meetings is disputed, but the result was that Peterson was removed from active flight status, and for the next three months received his salary from Piedmont while he searched for a new job. He began flying for Coleman Air Transport Company on October 1, 1979.

Peterson contends that Piedmont fired him under pressure from ALPA, which had allegedly staged a surreptitious slowdown of flight operations. Furthermore, Peterson alleges that this slowdown was part of a much larger conspiracy by ALPA to punish all those pilots who flew for Wien during the strike. Peterson originally sued Piedmont and certain individual pilots, as well as ALPA. Against Piedmont he alleged claims for breach of contract, breach of duty of good faith and fair dealing, and violation of the Railway Labor Act, 45 U.S.C. § 151 et seq. (RLA). Against ALPA and the individual pilots he alleged claims for conspiracy, blacklisting, and intentional interference with a contractual relationship, and against ALPA he alleged a claim for breach of its duty of fair representation (DFR).

This court has previously ruled that the RLA preempts the state claims, thus mandating dismissal of the individual pilots and all claims for punitive damages against ALPA. *Peterson v. Air Line Pilots Association*, No. C–80–341–WS (M.D.N.C. Jan. 27, 1983) (memorandum opinion). At that same time ALPA's motion to remove the case from the jury calendar was denied, and plaintiff's motion to amend his Complaint to include Piedmont in his DFR claim was granted.

Shortly thereafter, by Order entered August 11, 1983, defendant's motion to strike plaintiff's Second Amended Complaint was granted, and plaintiff filed a Third Amended Complaint on August 19, 1983. Subsequently, defendants ALPA and Piedmont moved for summary judgment on the remaining claims based on *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), which had been decided during the

pendency of this case. In *DelCostello* the Supreme Court held that the six-month statute of limitations in Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160, applies to actions brought by an employee jointly for breach of contract against the employer and for breach of the duty of fair representation against the union. Determining that *DelCostello* applied retroactively to the subject case, this court concluded that Peterson's action was time-barred and should be dismissed with prejudice. *Peterson v. Air Line Pilots Association,* No. C–80–341–WS (M.D.N.C. Jan. 19, 1984) (order granting summary judgment).

While Peterson's appeal was pending, he and Piedmont negotiated a settlement and Peterson dismissed his claim against Piedmont in exchange for a sum of money. Subsequently the Fourth Circuit Court of Appeals determined that, by not pleading the statute of limitations until three years after Peterson's initial complaint, ALPA had waived its right to rely on that defense. Thus, the Court of Appeals reversed this court's dismissal of Peterson's action. In the same opinion the Court of Appeals affirmed the dismissal of Peterson's state-law claims and his claims for punitive damages. *Peterson v. Air Line Pilots Association,* 759 F.2d 1161 (4th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).

On remand defendant ALPA has once again moved for summary judgment. ALPA argues, first, that Peterson forfeited his claim by refusing reinstatement at Wien; second, that Peterson should not be allowed to claim as damages lost future earnings; third, that Peterson's settlement with Piedmont bars recovery against ALPA; fourth, that since damages are not recoverable and the remaining claims for relief are equitable in nature, jury trial is inappropriate; and fifth, that Peterson's claim for attorney's fees should be dismissed. After considering the briefs and affidavits submitted by the parties and all matters of record, the court concludes that summary judgment should be denied on each ground raised by defendant.

### 1. Refusal to Return to Wien

It is undisputed that Peterson was offered a permanent position as a pilot with Wien Air Alaska, beginning March 1981, and that he declined. ALPA contends that any claim for damages by Peterson is truncated at that point.

Peterson had worked for Wien as a B–737 co-pilot for almost two years during the ALPA strike and, according to the ALPA–Wien collective bargaining agreement, was entitled to be recalled by Wien as soon as a vacancy arose, in accordance with his accumulated seniority. After he left Piedmont under the circumstances disputed in this case, Peterson worked briefly for Coleman Air Transport Company in Illinois, and then moved to Las Vegas to fly for E.G. & G., Inc. In March 1981, when he was recalled by Wien, Peterson was earning $36,000 per year at E.G. & G.; at Wien he would have earned approximately $33,000 initially, but would shortly have received a raise to approximately $40,000. Peterson refused the Wien recall, however, because he claims that he was assaulted and beaten during the strike, that he had suffered harassment while at Piedmont, and that he knew of other incidents of harassment and vandalism against pilots who had flown during the strike and since been recalled to Wien. Although ALPA contends that it would be unreasonable to presume that the animosities of the strike would continue even after the strike had ended, it seems eminently reasonable that an employee who had suffered such indignities, especially one who had confronted this powerful union by filing suit, would continue to suffer abuse from ALPA members.

■ An employee is under a duty to make a reasonable effort to secure interim employment to mitigate the damages resulting from his wrongful discharge. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 197–200, 61 S.Ct. 845, 853–55, 85 L.Ed. 1271 (1941); *United Industrial Workers of the Seafarers International Union v. Board of Trustees of Galveston Wharves,*

400 F.2d 320 (5th Cir.1968) (RLA); *See, e.g., Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (Title VII); *Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614 (6th Cir.1983) (Title VII); *EEOC v. Sandia Corp.,* 639 F.2d 600 (10th Cir.1980) (ADEA). He is not required, however, to accept a position that is not consonant with his particular skills, background, and expertise, or which involves conditions that are substantially more onerous than his previous position. *NLRB v. Laredo Packing Co.,* 730 F.2d 405 (5th Cir.1984); *NLRB v. Madison Couriers, Inc.,* 472 F.2d 1307, 1320–21 (D.C.Cir.1972).

ALPA argues that an employer charged with unlawful discrimination often can suspend the accrual of backpay liability by unconditionally offering the claimant the job he sought, citing *Ford Motor Co.,* 458 U.S. at 232, 102 S.Ct. at 3066. While this is an accurate statement of the law, ALPA's reliance upon it is misplaced. Wien Airlines, which offered Peterson the job, was not the offending party here. Instead, Peterson's claim is that Piedmont wrongfully fired him at the insistence of ALPA. The position Peterson claims to have been wrongfully deprived of was the one he enjoyed at Piedmont before it was discovered that he had flown for Wien during the strike: Peterson had been a probationary flight officer who was allowed to undertake his duties without interference and harassment. ALPA's reliance on *Ford Motor Co.* would be more sound if Piedmont had offered Peterson his former position.

■ Nevertheless, if Peterson could have mitigated his damages by accepting the recall from Wien, he was under a duty to do so. *Phelps Dodge, supra.* It is not contemplated by the mitigation requirement of the RLA, however, that a wrongfully discharged employee be forced to accept a position where he feels that his career and personal safety are threatened. *Laredo Packing Co., supra.* If, as Peterson claims, he declined Wien's offer for fear of retribution from former strikers,

then he was not required, as a matter of law, to accept the position. The reasonableness of Peterson's decision is a question of fact, and summary judgment should be denied.

### 2. Future Earnings

■ "Frontpay," or recovery for future earnings, can be an appropriate remedy where reinstatement is unavailable or inappropriate. *Thompson v. Brotherhood of Sleeping Car Porters,* 367 F.2d 489 (4th Cir.1966), *cert. denied,* 386 U.S. 960, 87 S.Ct. 1019, 18 L.Ed.2d 110 (1967); *See O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543 (11th Cir.1984) (frontpay appropriate when reinstatement reasonably refused). It is the obligation of the court, if Peterson was wrongly damaged, to fashion whatever remedy would best make him whole. *Thompson,* 367 F.2d at 493. The propriety of reinstatement at Piedmont cannot be determined at this juncture, but it could be an impracticable remedy because of the passage of time, *see DeArroyo v. Sindicato De Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 121, 27 L.Ed.2d 115 (1970) (no reinstatement because six years had passed), or because of animosity by Piedmont pilots. *See Spagnuolo v. Whirlpool Corp.,* 641 F.2d 1109 (4th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981) (reinstatement inappropriate where hostility prevents necessary cooperation); *accord, EEOC v. Prudential Federal Savings & Loan Association,* 763 F.2d 1166 (10th Cir.1985); *Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1319 (9th Cir.), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982). Therefore, the appropriateness of frontpay cannot be determined as a matter of law.

■ ALPA argues that Peterson's claims for future earnings must fail because they are highly speculative. This same argument was rejected by the court in *Thompson* because, although future loss cannot be established precisely, an injured

party is "not barred from a reasonable recovery merely because he is unable to prove his damages with absolute certainty." 367 F.2d at 493. ALPA contends that *Thompson* has effectively been overruled on this issue by *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 631 F.2d 263 (4th Cir.1980), in which the court held that a union was not liable for failure to fairly represent an employee because the employer had the right to fire him. The discharged employee could not recover backpay from the union, the court held, because the employee had no right to receive the pay even if competently represented by the union. ALPA contends that, since Peterson was a probationary employee when he left Piedmont, Piedmont could rightfully terminate him and *Newport News* controls. The case is easily distinguished, however. In *Newport News* there was no claim that the employer and the union were acting in concert as there is here. In addition, Peterson has alleged that this discharge by Piedmont was an unfair labor practice, while in *Newport News* the firing was not. Therefore, *Newport News* is inapposite. If Peterson's allegations are true, and they must be assumed so at this juncture, ALPA cannot coerce Piedmont into firing Peterson and then avoid liability for his lost earnings.

■ ALPA contends, and rightly so, that any liability must be apportioned between the employer and the union "according to the damage caused by the fault of each." *Vaca v. Sipes*, 386 U.S. 171, 197, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967). If Peterson's contentions are true, there is every likelihood that a jury may find the union partly, if not fully, responsible for the wrong and proportionately liable. *See Czosek v. O'Mara*, 397 U.S. 25, 28–29, 90 S.Ct. 770, 772–73, 25 L.Ed.2d 21 (1970) (even if employer not party to litigation, damages recoverable from union for harm stemming from its conduct). Summary judgment should be denied.

### 3. Settlement with Piedmont

■ ALPA claims that Peterson's settlement with Piedmont during the pendency of the recent appellate proceedings bars his recovery from ALPA. It is true that damages for the breach of duty of fair representation are meant to compensate and no more. *Peterson*, 759 F.2d at 1167 (punitive damages inappropriate). ALPA's position presumes, perhaps wrongfully, that Peterson was made whole by his settlement with Piedmont. To avoid double recovery the settlement must be offset against the total amount of damages, but first those damages, if any, must be determined.

### 4. Trial by Jury

ALPA contends that, since damages are not recoverable by Peterson, his only claims are equitable in nature and, therefore, trial by jury is inappropriate. The preceding discussion deflates the major premise of that syllogism, and the argument falls.

ALPA also claims that, in light of *DelCostello*, the court must reconsider its earlier determination that Peterson is entitled to a jury. Nothing about *DelCostello* indicates that Peterson, in his claims for damages, is not entitled to a jury, and summary judgment should be denied on this issue.

### 5. Attorney's Fees

According to the "American Rule," the parties generally bear their own attorney's fees in the absence of statutory or contractual authorization. However, a federal court in the exercise of its equitable powers may award attorney's fees when the interests of justice require. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Precedent dictates that this authority be exercised only under limited and exceptional circumstances, commonly known as the "bad faith" and the "common benefit" exceptions to the American Rule. *Id.* at 5, 93 S.Ct. at 1946.

The first generally recognized exception allows an award of attorney's fees when the opposing party has acted in bad faith. *Hall, supra; Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *Vaughan v. Atkin-*

*son,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). In *Hall,* the Supreme Court stated that "it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" 412 U.S. at 5, 93 S.Ct. at 1946 (quoting 6 J. Moore, Federal Practice ¶ 54.77[2], at 1709 (2d ed. 1972)). A split of authority exists concerning exactly to what conduct the bad faith exception applies. It appears universally accepted that bad faith in the conduct of the litigation itself may warrant imposition of fees, as may the bad faith maintenance of a meritless claim or defense. *Shimman v. International Union of Operating Engineers, Local 18,* 744 F.2d 1226, 1230 (6th Cir.1984). On the other hand, some courts will award attorney's fees for bad faith in that conduct which gave rise to the litigation itself, *Dogherra v. Safeway Stores, Inc.,* 679 F.2d 1293 (9th Cir.), *cert. denied,* 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982); *Richardson v. Communications Workers, AFL–CIO,* 530 F.2d 126 (8th Cir. 1976); *accord Sierra Club v. United States Army Corps of Engineers,* 590 F.Supp. 1509 (S.D.N.Y.1984), while others will not. *Shimman, supra* (disapproving dicta in *Huecker v. Milburn,* 538 F.2d 1241 (6th Cir.1976)).

The pivotal case on this question is *Hall v. Cole. Hall* involved a suit by a union member who was expelled from the union for being critical of its practices. The district court held that the union had violated § 102 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 412, ordered reinstatement, and awarded attorney's fees. The court of appeals affirmed and the Supreme Court granted certiorari on the issue of attorney's fees only. Responding to the union's argument that fees were improper because the district court had expressly found that the union believed in good faith that it could expel its member, the Court stated that "[i]t is clear, however, that 'bad faith' may be found, *not only in the actions that led to the lawsuit,* but also in the conduct of the litigation." 412 U.S. at 15, 93 S.Ct. at 1951

(emphasis added). It is this language that the courts have relied on to award fees for bad faith in the conduct that formed the basis of the lawsuit, and Peterson urges that ALPA's treatment of him was so obnoxious that fees are warranted under this rationale. ALPA, not surprisingly, argues for adoption of the more restrictive view of *Shimman* and the denial of fees.

■ This presents a question of first impression in this Circuit. After due consideration, this court is persuaded that the bad faith exception to the American Rule does not apply to the conduct that led to the litigation. This holding is based on a number of considerations. First, Peterson bases his claim for fees on the above-quoted language from *Hall.* But the *Hall* Court was not presented with the question whether the bad faith exception applies to the conduct leading to the claim. Rather, the Court was considering application of the second, "common fund" exception to the American Rule (discussed *infra* ). The pertinent language in *Hall,* therefore, is dictum. *Shimman,* 744 F.2d at 1232–33.

More persuasive is that the *Hall* Court quoted *Moore's Federal Practice* for the proposition that fee shifting is appropriate when the "opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Hall,* 412 U.S. at 5, 93 S.Ct. at 1946. *Moore's Federal Practice,* however, precedes the quoted passage with the statement "where an unfounded action or defense is *brought or maintained ..."* 6 J. Moore, Federal Practice ¶ 54.77[2], at 1709 (2d ed. 1972) (emphasis added). When *Hall* is read closely and the pertinent language considered in context, it becomes apparent that the Court did not intend to extend application of the bad faith exception to the conduct upon which the claims were based. *See Shimman,* 744 F.2d at 1233.

A second flaw with applying the bad faith exception in these circumstances is that it defeats the rationale of the general rule that parties bear their own fees. Because the *Shimman* analysis of this point is thorough and persuasive, it is necessary

here only to adopt its reasoning and conclusion. *See Shimman,* 744 F.2d at 1231–32.

The third reason the bad faith exception is not appropriately applied in the subject case is that its basic rationale is punitive. *Hall,* 412 U.S. at 5, 93 S.Ct. at 1946. In *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the Supreme Court held that punitive damages "may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance." *Id.* at 52, 99 S.Ct. at 2128. In *Peterson,* the Fourth Circuit Court of Appeals held that *Foust* created a per se rule that a union's breach of its duty of fair representation can never render it liable for punitive damages. 759 F.2d at 1167. To apply the bad faith exception and award attorney's fees for the union's alleged bad faith treatment of Peterson would completely circumvent *Foust* and *Peterson.* Thus, it is concluded that the bad faith exception to the American Rule is not applicable to the DFR claim in the subject case.

The second recognized exception to the American Rule is the "common benefit" exception. Under this exception, the award of attorney's fees is within the discretion of the court when the "plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" *Hall,* 412 U.S. at 5, 93 S.Ct. at 1946 (quoting *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 393–94, 90 S.Ct. 616, 626–27, 24 L.Ed.2d 593 (1970)). Fee shifting is justified in that instance not because of the defendant's bad faith, but rather because it would unjustly reward the other members of the class to benefit from a plaintiff's efforts without sharing his costs. *Hall,* 412 U.S. at 6, 93 S.Ct. at 1946.

■ In *Hall* the Supreme Court upheld the award of attorney's fees to a union member who successfully sued and was reinstated into the union that had expelled him in violation of his First Amendment rights. The Court concluded that "there can be no doubt that, by vindicating his own right of free speech ..., respondent necessarily rendered a substantial service to his union as an institution and to all of its members." *Id.* at 8, 93 S.Ct. at 1948. Although, again, there is contradictory precedent on the application of this exception, our own Circuit has considered it in a case squarely in point. In *Harrison v. United Transportation Union,* 530 F.2d 558 (4th Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), the court held that a union member whose union improperly failed to pursue his grievance was entitled to recover attorney's fees under the common benefit rationale; by vindicating his right, the plaintiff had vindicated a right shared by all the union membership: the right to fair representation. *Id.* at 564. *See also Rolax v. Atlantic Coast Line Railroad Co.,* 186 F.2d 473, 481 (4th Cir.1951) (application of common benefit exception). *Contra Shimman,* 744 F.2d at 1235 (redress for personal injury does not benefit other union members; therefore, common benefit exception inapplicable).

While it is concluded that the bad faith exception of the American Rule cannot warrant an award of fees in the subject case, *Harrison* is persuasive that the common benefit exception pertains. The court cannot conclude that Peterson will not be able to prove facts sufficient to bring himself within a recognized exception to the rule that the parties bear their own costs, and, therefore, summary judgment should be denied.

For the foregoing reasons, it is ORDERED that defendant's motion for summary judgment is DENIED.